Next case is number 2012, 14th and 10th throughout Rosa Ozles. Next case is number combined 1392 network signatures against State Farms. Mr. Afersiallity is that correct? Yes, that is correct, and that is the necessary conclusion that has to be reached if one is to affirm. There are three basic reasons for why that conclusion can't be justified on this record. First and foremost, the rule articulated by the PTO in its own cases, the mistake of fact rule, and the definition it gives in the case entitled In Re 582, it defines mistake of fact. That's the PTO's opinion, it's their decision, it's their rule of law that's entitled to or the belief in something material that is not there. And they fence this concept, which obviously has some elasticity in it, but it's fenced by the pivot concept of a mistake of judgment, such that if what's going on originally is a judgment that's reached after analysis, synthesis, studying the claims of prior art  and a mistake of judgment, as all the cases say, does not count. That definition comes out of In Re 582. Here, the facts that Mr. Karasik confronted really were a textbook case of mistake of fact. There had been an expression of commercial interest to the Navy on this very patent before the patent was abandoned for failure of paid maintenance fee. Because of an incredibly rare set of circumstances and the conflict... There was an attempt to express an interest. Correct, Your Honor. There had been... I mean, that's got to be accurate. There was no actual expression. There was an attempt. There was a telephone call into a 1-800 number, correct? I don't believe it was a 1-800 number, but there were... There was still an answering machine, but it didn't work. Yes, at the Technology Transfer Office of the NRL, and emails that weren't returned. And at this very time, the head of the TTO, the Technology Transfer Office, had Parkinson's. And it was well known, and it's undisputed in this record, that he was ill, he was not returning calls, that inquiries were not getting through and weren't filtering through the system. That was known. And so... And no attempt was made to correct that? To correct the... Well, the folks that were running the IP side in the Navy knew that if anybody wanted to express an interest in commercializing, it wasn't getting through. That the person whose job it was to take these calls was never around was ill, and that the telephones didn't work. Yeah, the record certainly has evidence that it was known about his illness, that it was known that it wasn't working. And Jean Kuhl was brought in, and she was sort of becoming the... She was a de facto head, and she eventually became the replacement right in this time frame. Spring, summer, exactly in the time frame. The judge seemed to think that the Carlson case stood in your way on materiality. What is your response to that? It does not stand in the way, Your Honor. It is a classic mistake of judgment case. It's said as much, and it's a case where the initial... Well, Your Honor... Yes? It is irrelevant, because that fact wasn't... It wasn't the litmus test for whether they wanted to renew their patent or not. In Carlson, they analyzed the claims in the prior arc, and they reached an opinion that this subject matter wasn't worth pursuing. And that was a judgment they reached. Later on, there was another fact that came along that caused them to conduct the same opinion. That's not a mistake of fact. That is a mistake of judgment. And here, the only record evidence is that it was a light switch decision for the Navy. Is there an expression of commercial interest? Yes or no? That's a factual question. It's not something that's the result of synthesis, analysis, and judgment. It's just a binary on-off type question. That wasn't present in Carlson, and it wasn't present in Maldague in Ray 582. What bothers me is that the judge below said, this is a close case, and then grants summary judgment. That seems to fly in the face of the standard. I agree, Your Honor. Fair Assents makes very clear that, and all of the sports cases, litany of cases that This is a Black Swan event. And in summary, judgment, it's almost non-existent. Paragon podiatry is the exception. This Court reverses cases where there have been adverse credibility findings of trial on specific intent. If there's a close case under Fair Assents and this applicable doctrine, you can't grant summary judgment. So, you know, you can. I wholeheartedly agree, and I think this case has to be reversed. But I don't think it has to be even remanded. I think it has to be reversed outright. Because if it's a close case, and here the district court even recognized that But doesn't a close case go to a trial then? Not on platform materiality because the standard is clear and convincing. So, if Mr. Karacek, and if a reasonable prosecutor, apprised of these facts in light of the PTO case law, could have reasonably believed that this was a That really goes to interpreting board law to figure out whether Carlson is the way you read Carlson or whether the other side reads Carlson. Correct, Your Honor. But Carlson is not on all fours. I think no one would dispute that there is no case from the PTO on all fours. There just isn't. So we are talking about a bunch of cases in the mistake of judgment realm and arguing about how in the shadow did they cast. And there's different arguments. State court argues that it casts a shadow that in some areas is misogynistic. But if this fact pattern, a reasonable lawyer could look at it under the PTO law and say, Yeah, that's a mistake of fact. And the district court also found that in the affirmative agreed misconduct section, Judge Thelma held, that Mr. Karacek, confirming these facts, could reasonably I thought part of the discussion also was whether or not it would have, given the facts as you see them, part of the question was whether or not the board and the PTO would deem the materiality when you're told it. I mean, I thought part of the argument was that, I mean, in certain circumstances, for example, if you were trying to justify it on a different ground other than being unintentional, you would have had to file an affidavit to support it. Here there is no such requirement. But people are saying, well, under the facts of this case, then shouldn't it, wouldn't the board expect you to have filed an affidavit even though one isn't required so that they can understand the rationale for why you think it was unintentional? And the answer is absolutely not. The board does not expect declarations in this scenario. That's why the form doesn't require one. It has a pre-populated declaration. There's the small box that the PTO has pre-populated with the required statement. And the code doesn't require a declaration here. It doesn't. I mean, the whole mix of the facts here have to do with whether or not the gentleman in charge, I don't know whether this is going to work or not. So he wasn't totally confident that when he filed his declaration, say it was unintentional, that if he told the whole story, he didn't know whether it would work or not. Now, I know that's a factor that's going to work against him for his intent. But the whole notion of the materiality seemed to me that this was an unusual set of facts. There isn't any one case in the board that sort of fits it. And I think that's right. There isn't one case, and it is an unusual set of facts. But what that means is that when you frame it out, it's not possible to say that the board clearly and convincingly would have looked at these facts and said, oh, we're rejecting because of these facts. There's no way to get there under the case law. Your Honor, I see I have a minute left, and I have to hand over the podium to the United States Amicus Council. So I'll take my minute for rebuttal. I'll take the case in address. Thank you. OK. Thank you, Mr. Officiato. Thank you, Mr. Sherr. Thank you, Your Honor. I'm Howard Sherr. I am an attorney with the Department of Justice, and I represent the Navy. And we're here to protect the Navy's intellectual property and reputation, Mr. Karasich, in this case. And that's why we've appeared as amicus. And maybe I should have asked your colleague, but what occurs to me, I always thought that it was well known that if somebody missed a maintenance fee date and then asked to have it reinstated, that the office was very benevolent and generous. After all, this was income to the Patent and Trademark Office, no harm. It was missed, as here, by a relatively short time. But I didn't see anyone arguing that the revival of this application was within the discretion of the office and should be reviewed on that basis. Am I wrong in thinking that that was an argument that could have been raised had circumstances overtaken the benevolence that, at least initially? Well, certainly, we've argued that that's the case out of the Rutan decision, where the PTO seems to take a benevolent view. Well, it's just practice. And there weren't very many cases before this court because it was done routinely. But in fairness, each time that the board looks at one of these cases regarding revival, it says it's within our discretion, and now here's what we're going to look at to make the determination. But all the cases teach, and it's the only thing that they teach from all of you, application of G and Carlson too, and I'll get to Carlson in a minute, is that if there's a mistake of fact, even if the decision is deliberate, but it's based on a mistake of fact, then it's not intentional. And therefore, revival follows. Now the question, and Goss, which is a 2006 case, explains Maldagu and application of G the same way. It understands this mistake of fact versus mistake of judgment. So the question is, how do we put Carlson in the mix? And Carlson, at page star six of the decision, and we cited this in our brief at 24 to 26, says, specifically, petitioner contends that the incident petition is based on a mistake of fact and not a change of mind after reviewing the facts a second time. Nevertheless, the latter condition is precisely the situation herein. And so the point is, what were the facts that were reviewed a second time in Carlson? And although the trigger for the review of the facts was the appearance of an apparent infringer, the second look at the facts in that case was Welsh's re-evaluation of Claims 1 to 14, which always existed. He had evaluated the claims one way the first time, said we might as well let the patent go abandoned. And then when this infringer, or apparent infringer, appeared on the scene, he went back to re-evaluate Claims 1 to 14. They were always in the case. They were always there. And that's the differentiating point between Carlson and what we have here. We don't have a re-evaluation of previous facts. It was just that the facts were unknown because of the problems with the voicemail system, et cetera, and apparently unknowable for that reason until Ansari makes its connection on May 10th. So that specific intent, the materiality part of this, I think, I think the case is easily one for saying that Karasich acted appropriately in synthesizing the information or the status of the cases before the Patent and Trademark Office in saying that it is not but for material. That in fact, had I presented all the evidence to the Patent and Trademark Office, it would have been granted. The state firm hasn't had a chance to cross-examine Karasich, correct? They had a deposition that they used instead from a different case. From a previous case. Yeah. I mean, so this case was being decided on summary judgment on the basis of depositions given in a previous case. Could they have taken this deposition? I think so. I don't think there was any. I'm unaware of any reason for not taking it. My understanding was it was just an on-the-call record based on the depositions from the previous case. And the declaration. If you had a trial, you might well have Karasich called and put on the stand and then cross-examined. I believe Karasich's statement in the previous deposition was that he wasn't aware of Carlson. I think that... When he had... I'm not sure I can reflect on it. I think that may be right. I think the fact... You should know what he said. I think the fact is that he said, when he synthesized all the cases, he saw the difference between mistake of fact and mistake of judgment. And that was the basis for claiming unintentionality. And I think, Mr. Alperciabi, is correct that while the intent was... What I was trying to get at is, from where I'm coming from, it seemed to me that it was very difficult to do at least intent on summary judgment here, but that the whole truth and nothing but the truth really hasn't been heard yet. So I do have a tough... It hasn't been a trial. Yes. I would have a tough task to try to convince you that on the intent side of the equation, you could find on the record in favor of NSI and actually reverse outright. But I think on the but-for materiality, you can make that determination. In fact, there is no way to say there's clear and convincing evidence that this is but-for material, based on all of the PTO law that we've presented, and including the way we've differentiated and shown the Court how the Carlson case actually fits in with the Maldague and the application of G principles. Thank you, Mr. Sheriff. Thank you, Your Honor. Mr. Parrish. Thank you, Your Honor. May it please the Court.  First, I'd like to explain specifically why their reading of the cases on but-for materiality just doesn't work. Second, Judge Wallach, I'd like to turn to your point about the Coase case and explain exactly what the District Court was saying there. And third, we haven't talked about it much, but Judge Clevenger, I think that given the undisputed facts that they testified to, this is one of those cases where the District Court judge got it right and that their sentence factors for a specific intent are satisfied. I'd like to address that. I think you have a very, very hard road to hoe on demonstrating that this counsel under these circumstances committed fraud. Your Honor, I think this is right, which is why Fair Sense made clear that there was a three-part test. That three-part test is not sort of a swearing match. You have to do three things. Look, did he know about the information? Did he know that it was material? And did he make a deliberate decision not to disclose it? One and three really aren't disputed, so all the action is at number two. Well, well, did he make a deliberate decision not to disclose the information when he knew he didn't have to? Well, and Your Honor, I think that's, to the extent that that blends into two, which I think goes to the question, did he think that the information was material under his own interpretation of the law? And Your Honor, what we would say is that first, in his declaration itself, you have to take a look at the facts. This Court has been very clear that unsupported conclusions don't count. But looking at the facts, what we do know is that even under his view of materiality, which we don't think is even remotely supported by the case law, we'll walk through that, but even under his view, he did not have enough information at the time that he made his decision to actually say it was unintentional. So what did he know and what did he admit that he knew? He knew three things. One, he had a conversation with Ms. Cole. Ms. Cole told him that she had been contacted by Mr. Ansari, and she also, this is disputed, but reading it in his favor, she also told him that there had been previous contacts that were unsuccessful. But the record is clear, both from Ms. Cole's testimony and from Mr. Krausek, that there was nothing else that was done. He did not follow up on that. He did not corroborate. But he'd already filed the petition. Your Honor, this is at the time before he filed the petition, when he decides whether to file the petition, this is the information that he has that allows him to make that decision. And what I'm saying is, first, he had this preliminary contact with Ms. Cole. Second, in his declaration on paragraph five, he admits that he has no knowledge about the decision to abandon at all. So the only thing he looks at is that A440 in the joint appendix, which is the report where it says, no, we've decided not to renew. That report is dated January 2003, January 14th. The third piece of information that he said that he has is that he asked two of his associates to do some research, and based on an oral report, he feels that it fits in with the mistake-of-fact definition. Under his view of the mistake-of-fact definition, he applies two things. He says, one, there had to be some change in circumstances that would have resulted in a different decision. And he says the Black's Law Dictionary applies, which says that it needs to be for reasons not of legal neglect. We dispute that. We don't think there's any support in that in the K-4. But giving him his due, even if you get past that and say, OK, his reading is reasonable, he still could not have made a decision at that point that it was unintentional. He did not do any investigation as to why the decision was made to abandon the patent. Was it because there's something about the patent? Was it simply because of a day-to-day of on-off, which we don't know, he did not know. So doesn't the record show that there was no commercial interest, and therefore, it was a basis? Your Honor, the record shows that. Your Honor, no, what the record shows is that on January, the information he looked at, not the record as a whole, but the information that was before him, was this report at JA-440. What that report shows is that there's 20 pages of patents. There's eight patents on the 440 page. And all it shows is yes, no, yes, no. Now, what they do is they go through it and they make a decision as to whether there is commercial value, but they also have other reasons they may not want to keep a patent for us. He does not know at the time he submits it. He has not done any investigation at all at that point, so he has to assume that. He also, he doesn't know whether the inquiry by Mr. Ansari is for any legitimate reason. Under the Navy's own policies, they are only supposed to license patents when it's going to be used for productive use, a commercial value. Now, it turns out that his mistake here is actually really what's wrong with his case, which is that it turns out Mr. Ansari, after the fact, doesn't want to use this for any productive, commercial reason. He just wants to use it so he can sue. But the point is, is at the time that Mr. Karasek made his decision, he did not have any information as to whether that initial inquiry was sufficient to be something that was actually a commercial interest that was legitimate under the Navy's own policy. And then lastly, he didn't know the timing. Is it illegitimate for the Navy to make money? No, Your Honor, but the Navy is not supposed to license patents solely for purposes of litigation. They're supposed to license them for productive, commercial use. He has to know at the time whether the person who's calling actually has a reasonable... Where is that in the record? Your Honor, let me see if I can find it for you. I don't know. I do know that in our brief we cite the cases that talk about this, but I'm sorry, I just don't know where I left off. But let me get that for you. If I may, though, even regardless of that, I have a third point, which is that the timing, even under his theory, doesn't work in the sense that the decision was made in January 2003, or maybe some point, but the inquiries didn't come in until April, even under his view of the facts. So there's a difference between when the initial decision was made to abandon the patent and when the facts arguably could have come to light. He at least needed to do some investigation to find out whether that would have changed the decision in terms of the timing. Going back to the but-for materiality, which I would like to get to, the key point is that the regulation doesn't say that the decision was unintentional. What the regulation has to say is that the delay was unintentional. And this is why their reading of the cases on but-for materiality makes no sense at all. What the PTO is getting at there is if you make an intentional decision to renew the patent, and for some reason the delay prevents you from doing that, it gets lost in the mail, you write the wrong number down, there's some confusion over what the patent is, then the delay is excused as a mistake in fact. But what all of the cases, including the cases he relies on, say, if it's an intentional decision, you can't negate the intent just because there's more information that comes back later. That's why the district court correctly recognized that NREG often is on all fours. In fact, Your Honors, if you take a look at the information that's attached to his own research, this is the memo that he prepared in July, that after the fact documented the reasons why he thought it was legitimate. This is at JA 456. So if somebody calls and leaves a message on the office answering machine saying, hey, renew that pet, and there's an electrical surge and the answering machine goes blank, you're saying that doesn't... If the decision maker who was supposed to decide makes a decision on the information that's known to that person intentionally not to renew the patent, that's a deliberate decision. There's nothing that renders it unintentional even if additional information comes to light. That's exactly what happens in NREG Carlson when there's new information that comes to light. And the reason, and this is exactly why the PTO form is very bare and why Judge Newman, the PTO does accept on faith the duty of candor because the point is that an unintentional failure to renew is one of those situations where, not because new information comes to light, that could always be a way of sort of caning the system. Instead, what it's for is true clerical errors or other mistakes. And, in fact, what I was going to say, Judge Walwick, is that in his own memo, I believe this was on JA 456, he attaches the information that he researched. And one of the things that he attaches there is the PTO's own manual. And what the manual emphasizes, and it says, if I may read, these matters simply confuse the question of whether there was a deliberate decision not to continue the prosecution of an application with why there was a deliberate decision. And that point here is that at the time in January or whenever they made the decision not to renew these patents, including patent 122, the question was whether there was a deliberate decision. Yes, there was a deliberate decision. And if you take a look at the In Re Malvocate or Malvocate that he relies on, that case never says anything about what mistake of fact means. What it says is it's important to distinguish between mistake of fact and a situation where you look at the same information. In logic, what it's saying is it's important to recognize A versus B. But it never says in the opinion, the negative interest, that not B, therefore A. That's the logical conclusion that he took from just reading those cases, not B, therefore A, without forgetting about the rest of the alphabet. The problem is if he looked at Malvocate, and he would have realized that case is against him. If he took a look at In Re Carlson, which relies on Malvocate extensively, he would have realized that there has been no PTO decision ever, no PTO decision ever, that has ever found a mistake of fact at all, much less on his theory, which is this new theory that as long as new information comes to light, he said, oh, we could have considered it. So the read that he relies on for mistake of fact, even today in this court, is extremely thin. I would urge the court to look at all of the cases that he cites, because you'll see that nowhere in there is his rule set forth. And this is why Judge Wallach, I think the district court, was making the point about a closed case. He makes that term, I think, in two or three different places. He first says, there's this question of whether there's egregious misconduct or not. And he says, you know, it doesn't reach that level. It's a closed case, he says, but it doesn't reach that level. The reason I think the district court says that is because this reading of the case law is just so poor, and all of the activities that occurred are not the type of activities that a lawyer that has a duty of candor to the PTO should have been undertaking. But then he goes on, and Judge Wallach, I think this is what you're talking about, is that he later talks about why this is closed. But at that context, he's talking about but-for materiality, and he's looking at specific intent. And the reason why he says it's closed is he says, it's closed because I'm taking all of the facts in the favor, most favorable to the Navy. I'm looking at all the facts in their most favor. And yes, it is closed. But the reason why it's closed is in those cases, the regulations specifically tell you what you're supposed to do, which is disclose. The regulation specifically says, and this is in 11.08, it says, if you're submitting something, and there is a reason for you to think that there's a fact that will be supported by further investigation, then you need to specify what those facts are and let us know that you think the facts will be played out. What the district court was getting at is that at the time that Mr. Krasick said this was unintentional, he knew that he could not, at that time, actually know that was true. All he could know at best was that he needed to do further investigation, and the further investigation could have been sufficient to perhaps support this new novel theory of the state of the fact. Even if that was true, right, at that point, even if it was a closed case under his reading of the case law, he had an obligation. He signed the declaration that allowed research was being conducted. Didn't he get an answer? It all happened on the same day. What he said, Your Honor, was that he had an oral report of the research. We don't know what that oral report was. What we do know is that it's JA456. That's the memo he prepared in July. That memo includes the patent manual, and it includes the in-ray malibu case, and it includes the in-ray G case. Why didn't you depose him, counsel? Your Honor, because of cost. One of the problems with this case is that it's actually absolutely right. If you were to send this back down for the judge to look at this in terms of specific intent and have factual findings, we are confident that we would win. But if we are entitled in these types of situations, when you have patent tools that are just suing because they want to make money, to rely on the record... And when you're accusing lawyers of conduct which should get their licenses suspended, if it was true, don't you think you have some sort of obligation to develop the record? Your Honor, this is not what this Court's decisions have said. So, for example, in the Paragons of Dietary case, what the Court said there when it grants summary judgment for inequitable conduct, it says that once somebody makes a primataceous showing, which is what we did, we had a primataceous showing, it's up to the other side to come forward. They had lots of opportunities. They certainly had the deposition in another case where he could explain entirely all the facts. And he was also entitled to submit his own declaration where he could have provided more facts that would have showed that there was some basis. But once you take a look at the deposition in the other case, you take a look at his declaration in this case, and you realize that the facts are still what they are, even as he tells them, which is that he did not have enough information at the time to submit it. Respectfully, Your Honor, at that point, we were entitled. And one of the reasons for that is that in this unique context, there is no other administrative remedy available in the sense that there's no way we can go back to the PTO, as far as I know, and ask them to go ahead and say, look, we should not have renewed that patent. And if you think about it, what happens is the public is entitled to rely on the fact that a patent gets into the public. It should only be in those rare circumstances, where once a patent becomes public, that the PTO then goes ahead and renews it, for circumstances like contemplated under the regulations, when there's actually something that was unintentional. But once there's a disposition... So how rare is that circumstance? Well, Your Honor, in terms of... It's hard to say. What I would say is that in terms of true mistake of fact situations, we don't know because we don't know how many people say this is a situation where... Well, Your Honor, I guess what I would say is if you take a look at the cases where somebody actually realizes that there's a question and they follow through their obligation by submitting extra material. These are the cases we review where they do that. Then the PTO does not because in those cases where they look at it and say, look, this is an unmistakable fact. In situations where there is a clerical error and you look at what the regulations that they actually read are and you say, look, this is true, it is true that they regularly do that. I don't know whether it's a case that the PTO... The folks that got tripped up and were held to have failed the proper test are the ones that coughed up a little more information. Is it... I mean, so if you just say, well, I think this delay was unintentional. You sign unintentional and you send in the money. Case is over. PTO accepts it as a matter of course. The only time you're likely to stub your toe over what really goes on, what's happening is if you volunteer more information and then the PTO, unlike what Judge Newman said, they start getting fussy, right, and start policing. Your Honor, absolutely right. And Mr. Krasick knew that, but that's just the reason that the system... That's part of your case against him is that he knew that... Your Honor... He knew there were cases out there in which people had coughed up some information that they didn't have to and lost. In fact, in Judge Wallace, that's why I'm willing to assume that this happens because most lawyers, when they put on notice of this, will actually come forward. And most of the time, these are legitimate extension requests because it is true. And I don't ascribe any bad intent to the Navy generally. There are a lot of these patents that sometimes they have a big portfolio. There may be legitimate reasons for clerical error otherwise. But when you put on notice that you know you have to do further investigation... I know we're running over time, but I do... Did you have authority for the position that there's no way of challenging directly the PTO decision to grant the...to revive the patent and accept the fee? Your Honor, I don't accept... All I can tell you is we looked to see whether there'd be any administrative process where you could do this, and we could not find anything. Well, all that I'm thinking of is that we recently saw a case where the PTO accepted a balance check, which was then, after the deadline, made good. And the whole issue was presented through the hierarchy of appeals. It seems to me that this...I was surprised a little bit to see it litigated, perhaps because those events don't occur very often. What I would say, Your Honor, is that the cases that we cite in our brief stand for the proposition that you can't use this as a defense to... Well, there are very specific facts, yes. You can bring an APA cause of action. You know, Your Honor, we looked into that. I think that's an open question as to whether we could. What could happen is that the Navy could go back and disclose these facts, and the PTO could change its decision. But I do think this is why the inequitable conduct works in this sense. I mean, it is true that Deresent put a very high bar, but that's because usually but-for materiality actually is a difficult inquiry. And here, with respect, as you read the cases, you will see that there's nothing that supports their position. And so then you look at specific intent. And I'm completely willing to concede, as this Court has said in many cases, that summary judgment is very rare. But let me just say one thing. The opposing counsel has said that for but-for materiality, it's a clear and convincing standard. Your Honor, with respect, that's wrong. If you take a look at the Deresent case, pages 1291 to 92, it's not clear and convincing. It's a preponderance of the evidence. I don't think it matters, though. But for purposes of the but-for materiality, you apply preponderance of evidence. For purposes of specific intent, clear and convincing. All of that sort of washes away, though, at least on the clear and convincing side, because it's their own facts that are being used. And I thank the Court for its time. Unless you have any other questions, we urge you to affirm the district court's decision. Okay. Thank you, Mr. Parrish. Mr. Alfres-Giardi? Thank you, Your Honor. Very quickly, picking up on the last point, the clear and convincing standard, I'll give you a list of cases that have said both the but-for materiality and specific intent are subject to the clear and convincing standard. We have subsequent Pherasense, the in-ray calcium patent litigation at 703 F3, 519. Outside the box, which is cited in every 695 F3 at 1290. First media, 694 F3 at 1372. There's a linking of cases before Pherasense. The Eagles case, the scanner tech case we've also cited. Both prongs require clear and convincing evidence here. Paragon was mentioned. Paragon stands really in a constellation of its own. It's a very, very unique fact pattern where the PTO specifically asked the prosecuting attorney for a declaration from someone who was not biased without a conflict of interest. They gave a declaration from someone who did have a financial interest and didn't disclose it. So in response to a direct specific question, they lied. And a summary judgment here was affirmed. That is the only context. Finally, the patrol comment is deeply inappropriate. My client showed commercial success, practical completion of the invention, and commercialization. They had to do that in order to get a patent license from the Navy. There's no evidence in this record of this patrol assertion. We take great offense to it, Your Honors. I see I'm out of time if the Court has any. Any more questions? Any more questions? Okay. Thank you. Thank you. All the cases taken in this position.